UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 13-cr-00071 |
| VERSUS | JUDGE STAGG |
| DARRELL R. JOHNS | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Defendant, a three-time convicted felon, is charged in this court as a Felon in Possession of a Firearm. 18 U.S.C. § 922(g)(1). The current charge arises out of a traffic stop in Shreveport.

Before the court is Defendant's Motion to Suppress. Doc. 33. Defendant argues that the search of his vehicle and the subsequent search of his residence violated the Fourth Amendment. For the reasons that follow, it is recommended that Defendant's motion be denied.

**The Facts**

An evidentiary hearing was held on July 24, 2013. The evidence at the hearing, including an audio and video recording of the traffic stop (Government Exhibit 1), establishes the following facts. On February 11, 2011, Shreveport police officers Brad Sotak and Chris Bordelon were on routine patrol in a marked cruiser. During their briefing held earlier that day, the officers were made aware that there was a BOLO (be on the lookout) for

a gold colored Tahoe with 22-inch rims that was reported to be in the Shreveport area. The driver was wanted for attempted murder in New Orleans. The BOLO (Government Exhibit 2) reported the vehicle license plate tag number and that the subject was armed and dangerous.

The officers spotted a light gold or beige colored vehicle that matched the description in the BOLO, except that the vehicle had a temporary paper license tag which the officers could not read. The officers conducted a traffic stop to investigate the vehicle and driver in reference to the BOLO and the unreadable temporary tag.

In light of the BOLO and concern about the potential dangerousness of the driver, the officers approached the vehicle and asked the driver for his driver's license. Defendant responded that he did not have a driver's license. The officers then asked Defendant if he was okay, because he was visibly shaking. The officers then asked Defendant to step outside the vehicle and patted him down for weapons. Defendant stated he was nervous because he did not have a driver's license and he was on state probation. The officers noticed a strong smell of burnt marijuana on Defendant and coming from the vehicle. The officers then asked Defendant to take a seat in the back of their cruiser while they sorted out what was going on. Defendant was not handcuffed.

About four minutes after the stop began, the officers asked Defendant "do you care if I look in your car?" Defendant responded: "No, sir." When the officers opened the glove box, they found a small brown paper bag that contained a box of Remington .40 caliber handgun ammunition and a receipt for the ammo from a local pawn shop. The receipt was

dated a few days before the stop. The box, designed to hold approximately 25 rounds of ammunition, contained only 11.

The officers approached Defendant in the backseat of the car and confronted him about the box of ammunition. Before Defendant could respond, the officers orally advised Defendant of his Miranda rights. Defendant indicated that he understood those rights. Defendant denied knowledge of the ammunition and stated there were no guns or drugs in the vehicle.

The officers ran Defendant's name for warrants, and learned there were no outstanding warrants. However, the officers confirmed that Defendant's driver's license had been suspended. The officers also were unable to match the vehicle's VIN to the temporary tag. In fact, the officers determined that the VIN belonged to a black Cadillac. Defendant protested that the vehicle he was driving was a 2010 Cadillac Escalade, but the vehicle was not black, had not been repainted, and bore no labels or markings of any kind identifying the make or model of the vehicle. The lack of labels or markings is confirmed by the officer's dash camera recording.

The officers contacted Defendant's probation officer, Vicki Best Masters, and advised her of their encounter with Defendant. Masters asked the officers to bring Defendant to her at the Office of Probation and Parole in Shreveport. When the officers arrived at Masters' office, she told Defendant to give her a urine sample for a drug screen. Defendant responded that the test would show he was positive for marijuana. Masters then advised Defendant of his Miranda rights and placed handcuffs on him.

Several officers from Louisiana Probation and Parole then drove Defendant to his residence. As a condition of Defendant's probation, he had signed acknowledgments that his home could be searched (Government Exhibit 6) and that he could not possess a firearm or ammunition (Government Exhibit 7). When the probation officers arrived at Defendant's residence, Defendant's girlfriend answered the door. The probation officers entered the residence and requested access to Defendant's bedroom. The officers found a .40 caliber handgun under the mattress. Defendant's girlfriend confirmed that Defendant slept on the side of the bed where the gun was found. The gun was loaded with a magazine containing .40 caliber ammunition, the same caliber of ammunition found in Defendant's vehicle.

**Law Regarding Traffic Stops**

The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc). Under the two-part Terry reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) justified at its inception; and (2) reasonably related in scope to the circumstances which justified the interference in the first place. Terry, 392 U.S. at 19-20; Brigham, supra at 506-507; U.S. v. Lopez-Moreno, 420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100,

102 (5th Cir.1995). In making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir.2002).

An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. United States v. Lenz, 162 Fed. Appx. 379, 382 (5th Cir. 2006). Thus, an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. Scott v. United States, 436 U.S. 128, 138 (1978); Devenpeck v. Alford, 543 U.S. 146, 153 (2004). See also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ....").

As for the second prong of the Terry inquiry, generally, the detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges. Brigham, 382 F.3d at 507. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the

driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08.  An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508.  Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510.  See also Santiago, 310 F.3d 336, 341-42 (5th Cir. 2002); United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000).  A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); U.S. v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006).

**Search of Defendant's Vehicle**

The traffic stop and further detention of Defendant was perfectly justified.  The combination of the BOLO and the unreadable (or altered) temporary license tag gave the officers reasonable suspicion to stop the vehicle.  Once they made contact with Defendant, he was unable to produce a driver's license or other form of identification.  At that point, the officers had probable cause to arrest Defendant for driving with a suspended license.  The

officers also learned that the registration for the vehicle did not match the VIN and color of the vehicle. The officers continued to follow up on a litany of suspicious factors, which justified Defendant's continued detention and eventual arrest.

During the stop and while the officers were following up on their suspicions of criminal activity, Defendant consented to a search of his vehicle. There is no doubt about the voluntariness of that consent. Defendant readily admitted at the hearing that he consented to the search, and he conceded that he did so voluntarily.

Aside from Defendant's consent, there was also the strong smell of marijuana coming from the vehicle. The Fifth Circuit has repeatedly held that the smell of the marijuana gives rise to probable cause to search a vehicle for drugs. See, e.g., United States v. McSween, 53 F.3d 684, 686-687 (5th Cir. 1995)(the smell of marijuana alone may be enough for a finding of probable cause); United States v. Reed, 882 F.2d 147, 149 (5th Cir.1989) (the officer's detection of the odor of burnt marijuana "in itself ... justified the subsequent search of [the defendant's] vehicle"); United States v. Henke, 775 F.2d 641, 645 (5th Cir.1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."); United States v. Gordon, 722 F.2d 112, 114 (5th Cir.1983) (same); United States v. McLaughlin, 578 F.2d 1180, 1183 (5th Cir.1978) (same); and United States v. Sanchez, 199 F.3d 753, 760 (5th Cir. 1999)(same). See also United States v. Lork, 132 Fed. Appx. 34 (5th Cir. 2005)(detectable odor of marijuana emanating from a vehicle provides probable cause for the search of the vehicle; any questions regarding the length of detention or consent to the search are irrelevant).

**Search of Defendant's Residence**

The search of Defendant's residence, which resulted in discovery of the firearm, was also proper. The Supreme Court has held that a warrantless, non-consensual search of a probationer's residence on the basis of reasonable suspicion does not violate the Fourth Amendment. United States v. Knights, 534 U.S. 112, 114 (1987). See also United States v. Keith, 375 F.3d. 346, 347 (5th Cir. 2004).

Defendant signed a form acknowledging that his residence could be searched as a condition of his probation. He also signed a form acknowledging that he could not possess a firearm or ammunition. Defendant's probation officer, in her initial meeting with Defendant, removed a bullet from her desk drawer and showed it to Defendant. She told him that possession of a single bullet would get him federal time.

The officers knew Defendant was on probation and was driving a vehicle containing a half-empty box of ammunition (which was in a bag with a receipt showing the ammo had been recently purchased from a local pawn shop). These facts, as well as the other suspicious circumstances outlined above, gave the officers *at least* reasonable suspicion that Defendant's residence contained evidence that he was in possession of an illegal firearm.

**Conclusion**

Defendant's constitutional rights were not violated by the traffic stop and subsequent searches of his vehicle and residence. His motion to suppress should be denied.

Accordingly, **IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 33) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 7th day of August, 2013.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE